IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FARRAH KELLY,                          :    No. 4:22cv1940
     Plaintiff                    :
                         :    (Judge Munley)
    v.                            :
                         :
JOSHUA BELL, JUSTIN SNYDER,             :
and CITY OF WILLIAMSPORT,               :
     Defendants                   :
                         :
and                                    :
                         :
CHRISTOPHER SALISBURY and               :
CITY OF WILLIAMSPORT,                   :
     Consolidated Defendants      :

**MEMORANDUM**

    This consolidated civil rights action arises from the seizure of a motor vehicle pursuant to a search warrant.  Defendant Christopher Salisbury of the City of Williamsport's Bureau of Police obtained the warrant after an individual was wounded by gunfire in the city's downtown.  All told, Salisbury and the Bureau of Police retained custody of the vehicle for approximately nine weeks after execution of the search warrant.

    The owner of the vehicle, Plaintiff Farrah Kelly, now asserts claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against Officer Salisbury and his supervisors, Captain Joshua Bell, and Chief Justin Snyder.  Kelly claims these defendants violated the Fifth Amendment by temporarily taking her vehicle

without just compensation.  Kelly also advances a Section 1983 municipal liability claim against the city based on the alleged taking.

Before the court are cross-filed motions for summary judgment.  According to Kelly, the law requires judgment in her favor as to the defendants' liability. According to the defendants, they are immune from a Takings Clause claim under an exception discussed by the Third Circuit Court of Appeals in Frein v. Pennsylvania State Police, 47 F.4th 247 (3d Cir. 2022).  In addition, Defendants Salisbury, Bell, and Snyder reassert the principles of qualified immunity in this action.  As for the City of Williamsport, defendants contend that Kelly's municipal liability claim cannot proceed.  For the reasons discussed below, Kelly's motion for partial summary judgment will be denied.  Defendants' motion for summary judgment will be granted.

**Background**

Plaintiff Farrah Kelly is the owner of a rose gold Infiniti QX30 SUV.[1] (Doc. 43, Pl. SOF ¶ 3).  On April 5, 2022, Officer Salisbury received judicial approval to

---

[1] Unless otherwise noted, the factual background derives from the parties' statements of material facts (hereinafter "Pl. SOF" and "Def. SOF") filed pursuant to the Rules of Court for the Middle District of Pennsylvania. (Docs. 43, 47).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.  Otherwise, the court cites to the evidence in the summary judgment record.  The court reviews the evidence in the light most favorable to the non-moving party with respect to each motion for summary judgment. See Lawrence v. City of Philadelphia, Pa., 527 F.3d 299, 310 (3d Cir. 2008) (explaining that the summary judgment standard is no different when there are cross-motions for summary judgment).

search Kelly's vehicle pursuant to a warrant. <u>See</u> <u>id.</u> ¶ 4.  To Salisbury's

knowledge, an individual named Na'il Beyah operated the vehicle. (Doc. 47-2,

Def. Appx. 2).  Na'il Beyah is the plaintiff's son. (Doc. 47-4, Def. Appx. 4 Pl. Dep,

7:25–8:3).

Defendant Salisbury applied for the warrant to search Kelly's vehicle for 9

mm handguns, 9 mm ammunition, and firearm magazines "consistent with

evidence on scene." (Doc. 47-2).  Salisbury was also looking for clothing

"observed on video," which would identify Beyah and another individual,

Quahdeir Durrant. <u>Id.</u>

As further articulated in Salisbury's affidavit of probable cause, a shooting

occurred on April 3, 2022 at approximately 1:45 AM in Williamsport's downtown.

(Doc. 47-3, Def. Appx. 3 at ECF p. 2).  A stray bullet wounded a bystander

loading his vehicle with DJ equipment. <u>Id.</u>  Police also recovered live ammunition

and parts to a gun magazine in the street. <u>Id.</u>

Following the shooting, the Bureau of Police canvassed the area and

obtained surveillance video from several downtown businesses and the

Lycoming County Courthouse.  (Doc. 47-1, Def. Appx. 1, Incident Report at ECF

pp. 10, 12–13).  According to Salisbury's video review, the plaintiff's son, Na'il

Beyah, arrived downtown near the time of the shooting with Quahdeir Durrant.

(Doc. 47-3 at ECF p. 2).  They arrived in an Infiniti QX30.  Id.  Both men were identified by the police as members of the "400 Gang."  Id.

Beyah parked the QX30 on West Willow Street.  Id.  He subsequently engaged in a physical altercation with another individual, Daimeer Clark, in front of the Bar on Market, an establishment named for what it is and where it is located.  Id.  Per Officer Salisbury, he observed Clark come to that location with a bulge in his waistband consistent with a concealed firearm.  Id.  Clark attempted to pull out the firearm during the physical altercation with Beyah, but bar security stopped him.  Id.  Salisbury also observed Durrant acting in a manner as if he was also concealing a firearm.  Id.  Based on Salisbury's video review, Durrant did not involve himself in Beyah and Clark's physical altercation.  To Salisbury, Durrant looked like he was standing by as backup in case Clark had a gun.  Id.

Private security or other patrons broke up the fight in front of the Bar on Market.  Id. at 2.  Clark headed north on Market Street toward West Fourth Street.  Id.  Beyah and Durrant headed south toward the QX30 on Willow Street but did not get in the vehicle.  Id.  In a separate video, after the barfight had broken up, Salisbury observed Durrant running north on Court Street (one block west of Market) as if he was concealing a handgun.  Id.  To Officer Salisbury, it appeared that Durrant was attempting to ambush Clark and another male at the intersection of West Fourth and Court Streets.  Id. at 2-3.

According to the affidavit, it may not have worked out quite as Durrant had planned. Id.   As Durrant raised his arm like he was going to shoot, "another person fire[d] 10 rounds at Durrant[.]" Id.   Durrant "scramble[d] behind a car" and then fell. Id.   Nine live bullets and a magazine spring were later recovered by police in the area where Durrant fell. Id.   Per Salisbury's video review, Durrant retreated and then fled the scene with Beyah in Kelly's vehicle, i.e., the Infiniti QX30 listed in the warrant. Id.

Salisbury reviewed the video evidence with Defendant Bell, his supervisor. Id. at 2.   Per Officer Salisbury's affidavit, Captain Bell had knowledge that members of the 400 Gang commonly passed firearms to one another "and it would not be uncommon for Durrant to provide that same firearm to Beyah." Id. at 3. Salisbury also affirmed that Beyah and Durrant did not possess the requisite firearms licenses. Id. at 2.

Furthermore, Salisbury's affidavit also included information from a Pennsylvania State Trooper, identified only as "Thompson." Id. at 3.   From this information, Salisbury noted in his affidavit that Beyah was known to reside at an apartment and would park the Infiniti QX30 by dumpsters on the side of the building. Id.   But, according to information from Thompson, Beyah had parked the vehicle in an "abnormal" location, "trying to hide the car from view or disassociate it from his residence" after the gunfire on April 3, 2022. Id.

Defendant Salisbury submitted the search warrant application to the Honorable Nancy L. Butts of the Lycoming County Court of Common Pleas on April 5, 2022. (Doc. 47-2).  Judge Butts approved the warrant at 2:35 PM. Id. Judge Butts also signed the affidavit of probable cause. (Doc. 47-3).  Above her signature is Defendant Salisbury's summary of his knowledge up to that point in the investigation. Id.  Although the warrant sought guns, ammunition, and clothing in the QX30, the affidavit also noted that the car's computer system "could contain evidence in its memory to include, GPS Data, phone calls, contacts, messages and other information that is synced from the phone to the car." (Doc. 47-3 at ECF p. 3).

The Bureau of Police towed Kelly's vehicle that day. (Doc. 47-1 at ECF p. 19).  Beyah phoned his mother asking if she had taken the QX30. (Doc. 47-4, Pl. Dep., 19:18–20:13).  In a subsequent call, Beyah advised his mom that the police had towed the vehicle from outside his residence. Id.

Kelly began making efforts to recover the vehicle, calling the Williamsport Bureau of Police on the morning of April 6, 2022. Id.  Kelly spoke with Captain Bell, who advised plaintiff that officers had a warrant and were in the midst of an investigation. Id.  That same day, Kelly provided the police with a key to the

6

vehicle and, in exchange, received a copy of the search warrant.[2] Id. at 21:15–

22:22:15.  Related to the information in the warrant, Kelly testified:

> Q. And did you talk to your son at all about why the officers would want your vehicle and be searching for firearms and clothing that he had been wearing?
>
> A. My son, he didn't know anything about a firearm.
>
> Q. Okay. So did you talk to him?
>
> A. Yes, I questioned him about a firearm.
>
> Q. And did you learn at any time that the vehicle was used to flee the scene of where there had been a shooting?
>
> A. My – this was not discussed.
>
> Q. Ever, at all, from the time of when your car was seized to today sitting here?
>
> A. No.
>
> Q. You were not aware of that?
>
> A. No.

Id. at 23:15–24:12.[3]

---

[2] Kelly also testified that a non-party police officer threatened to break the windows of the vehicle to gain entry. (Doc. 47-4, Pl. Dep., 21:15–22:22:15).

[3] Kelly also testified that her son was friends with Quahdeir Durrant. (Doc. 47-4, Pl. Dep. 58:18–59:5). In her deposition, Kelly advised that Durrant was later shot and killed. Id. Information about that subsequent incident has not been provided by the parties in the summary judgment record.

The Bureau of Police searched Kelly's vehicle on April 7, 2022 at 8:00 AM. (Doc. 43, Pl. SOF ¶ 12).  Police did not recover the guns, magazines, or ammunition matching the physical evidence on scene or clothing associated with the individuals in the surveillance video during that search. See id. ¶ 13.

Nonetheless, the Bureau of Police continued to hold Kelly's vehicle. According to Defendant Salisbury, he spoke to Captain Bell about obtaining a separate search warrant for the vehicle's "infotainment system." (Doc. 47-7, Def. Appx. 7, C. Salisbury Dep. 29:18–30:4).  Per Salisbury, he hoped to obtain information about the GPS location of the vehicle and information about the devices connected to the vehicle, such as the names of those devices.  Id. at 31:3-9.  Salisbury further testified that he would use the GPS data to investigate whether evidence could have been moved to a different location.  Id. at 33:21–34:6.  According to Salisbury, location data could also provide investigators with different leads regarding other people who were involved in the incident.  Id.

Salisbury also testified that he and Captain Bell decided to hold on to the vehicle until they could determine if a search of that system would be fruitful or not.  Id.  He further testified that the timing of determining whether to obtain another search warrant "would depend largely on what [was] going on in the case at that time and where it [was] on the priority list of things to be done[.]"  Id. at

8

30:12–23.  Per Salisbury, he was following up on other leads. Id. at 41:25–42:7.

He testified, "it wasn't like number one on my list of things to do." Id.

Meanwhile, Kelly waited and continued to contact the Bureau of Police for information about the return of her vehicle.  She called Defendant Salisbury on multiple occasions. (Doc. 47-4, Pl. Dep., 20:10-18, 24:13–26:2, 33:4-17). Salisbury testified that he received voicemails from Kelly, but he did not recall returning her calls or speaking to her. (Doc. 47-7, C. Salisbury Dep., 28:11-18). After not receiving return calls about her vehicle from Captain Bell or from Chief Snyder, Kelly reached out to the Williamsport mayor's office in mid-April for help. (Doc. 47-4, Pl. Dep., 24:13–26:2, 33:4–34:12). Kelly received a return call from Captain Bell after Easter. Id. at 36:7–37:5.  According to Kelly, Bell told her that the Bureau of Police would not return the vehicle at that point and "that they were going for more search warrants." Id. at 24:13–26:2.  For his part, Captain Bell testified that Kelly asked questions about specifics of the police investigation, which he could not disclose. (Doc. 47-12, Def. Appx. 12, J. Bell Dep. at 36:5-12). In his deposition, Bell agreed that he basically told plaintiff that the Bureau of Police would release the vehicle when the investigating officer was finished with it. Id. at 36:13-17.

Kelly resumed making phone calls on April 27, 2022. (Doc. 47-4, Pl. Dep., 37:6–38:19).  After several more unreturned calls to the Bureau of Police,

including to Captain Bell and Chief Snyder, Kelly obtained counsel. Id. at 24:13–26:2, 37:6–39:11.  On Monday, May 9, 2022, Kelly's counsel hand-delivered a letter addressed to Chief Snyder requesting return of the vehicle. (Doc. 43-5, Pl. Ex. E at ECF p. 24).  The letter indicated that Kelly's counsel would be filing a motion for return of property that week if the police did not return her vehicle. Id. According to Chief Snyder, that letter prompted him "to ask some more questions" about where the department was with its investigation. (Doc. 47-13, Def. Appx. 13, J. Snyder Dep. 34:6–36:7).

That same day, on May 9, 2022, Defendant Salisbury documented in his incident report that he contacted a member of the Pennsylvania State Police Auto Theft Task Force.[4] (Doc. 47-1 at ECF p. 21).  Salisbury indicated in the report that he provided the state police with information about Kelly's vehicle relative to the infotainment system, but the state trooper determined that no data could be obtained from that system.  Id.  As Salisbury testified, the Pennsylvania State Police required the VIN number along with pictures of the steering wheel controls and the head unit of the vehicle to determine whether the software

---

[4] Although the court cites the police report, Salisbury's testimony indicates that he knew by the end of April or beginning of May 2022 that information could not be downloaded from the QX30's infotainment system.  (Doc. 47-7, C. Salisbury Dep. 31:18–23).  He testified that he could not recall the specific date, id. at 41:12-24, but referenced the report in discussing the timeline of events, id. at 31:18–23.  Although Salisbury was the lead officer in the shooting investigation, plaintiff did not question him about any of the other details contained within the police investigative report, which presents other evidence of an ongoing investigation.

maintained by the state police could extract data from the vehicle's computer system. (Doc. 47-7, C. Salisbury Dep. 41:14-21).

On Friday, May 13, 2022, Kelly's counsel proceeded with the motion for return of her vehicle pursuant to 42 PA. CONS. STAT. § 5806.[5] (Doc. 47-9, Def. Appx. 9). The Lycoming County Court of Common Pleas scheduled a hearing for June 6, 2022. (Doc. 43, Pl. SOF ¶ 54).

Prior to the hearing, on June 1, 2022, the Bureau of Police released Kelly's vehicle from impound. (Doc. 47, Def. SOF ¶ 35). Kelly testified that Defendant Salisbury called her to advise that the vehicle could be picked up. (Doc. 47-4, Pl. Dep, 26:10-18). Kelly picked up her vehicle from the Bureau of Police on June 3, 2022. (Doc. 47, Def. SOF ¶ 38).

According to Kelly, police never charged her son with a crime or questioned him regarding the shooting. (Doc. 47-4, Pl. Dep, 48:16–49:8). From the record provided by the parties, the Commonwealth moved forward with the prosecution of Daimeer Clark for crimes related to the April 3, 2022 gunfire.[6] As for Quahdeir

---

[5] This statute authorizes "[a] person aggrieved by a search and seizure" to move for the return of property in the Court of Common Pleas where the property is located. 42 PA. CONS. STAT. § 5806(a). The statute also directs that a hearing be scheduled within thirty (30) days of filing "to the extent practicable and consistent with the interests of justice[.]" Id.

[6] The redacted Bureau of Police incident report indicates that an individual was charged with several felony and misdemeanor counts related to the shooting. (Doc. 47-1 at ECF p. 3). On May 18, 2022, Salisbury obtained an arrest warrant for that individual for various firearms violations and charges related to the barfight and shooting. Id. at 21. According to the report, this individual was apprehended on May 23, 2022 in Philadelphia. Id. On May 27, 2022,

Durrant, the other individual involved on Beyah's side of the dispute, he was shot and killed in a subsequent incident. Id. at 58:18–59:5.

Despite the return of the vehicle, plaintiff proceeded with her action against the City of Williamsport in state court, seeking to recover attorneys' fees and costs, but not reimbursement for the time her vehicle sat in police custody. (Doc. 47-11, Def. Appx. 11). On August 17, 2022, the Honorable Eric R. Linhardt dismissed Kelly's motion in a memorandum order. Id. The Third Circuit issued its decision in Frein on August 30, 2022. This action followed in December 2022. (Doc. 1). After a period of discovery, the parties filed the instant cross-motions for summary judgment, with both sides relying on Frein. As discussed below, the framework provided by Frein immunizes Defendants Salisbury, Bell, and Snyder from Kelly's Takings Clause claim based on uncontroverted evidence in the summary judgment record.

**Jurisdiction**

The court has jurisdiction over these consolidated civil rights actions pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).

---

Salisbury met with Special Agent Chad Vigna from a different jurisdiction. Salisbury took possession of that individual's cell phone "as well as a .40 caliber Glock pistol that was stolen from" the Williamsport Bureau of Police "and recovered from the residence [where] he was staying." Id. From the other exhibits in the summary judgment record, the court can conclude that Clark was the individual charged and apprehended. Salisbury's report indicates that he closed the investigation on July 14, 2022, but noted that "there may be additional charges coming against other individuals involved in this case at a later date." Id.

**Standard of Review**

Before the court are cross-filed motions for summary judgment.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).

"When both parties move for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (cleaned up).  The Rule 56 standard does not change in the context of cross-filed motions. See id. (quoting Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987)); see also Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968) (holding that despite the "inherently contradictory claims" presented by parties each arguing they are entitled to summary judgment, if any genuine issues of material fact exist, they "must be disposed of by a plenary trial and not on summary judgment.").

**Analysis**

In this matter, Kelly asserts that the City of Williamsport failed to provide her with just compensation after its police department deprived her of the Infiniti QX30 for nine weeks. Kelly proceeds pursuant to Section 1983 for the alleged Fifth Amendment violation.[7] The nature of this dispute also requires some discussion of the Fourth Amendment and the police powers reserved to the States by the Tenth Amendment.

**1. The Takings Clause, the Warrant Clause, and Police Powers**

Among other things, the Fifth Amendment to the United States Constitution "prohibits the government from taking private property for public use without providing just compensation." Newark Cab Ass'n v. City of Newark, 901 F.3d 146, 151 (3d Cir. 2018).[8] In the United States of America, the "protection of

---

[7] Section 1983 creates a private cause of action to redress constitutional wrongs committed by state and municipal officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002). To establish a claim under Section 1983, the plaintiff must demonstrate (1) the deprivation of a constitutional right, and (2) that a "person acting under the color of state law" is responsible for the alleged deprivation. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

Earlier in this litigation, Kelly attempted to assert a direct Takings Clause claim against the City of Williamsport. (Doc. 35, Count III). The court dismissed that claim as redundant to the Section 1983 claim. Since that time, the Eleventh Circuit Court of Appeals has determined that the Takings Clause permits a direct cause of action against local governments. Fulton v. Fulton Cnty. Bd. of Commissioners, 148 F.4th 1224, 1243 (11th Cir. 2025).

[8] The Takings Clause has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment. See McDonald v. City of Chicago, Ill., 561 U.S. 742, 759 (2010) (citing Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226 (1897)).

property rights is 'necessary to preserve freedom' and 'empowers persons to

shape and to plan their own destiny in a world where governments are always

eager to do so for them.' " Cedar Point Nursery v. Hassid, 594 U.S. 139, 147

(2021) (quoting Murr v. Wisconsin, 582 U. S. 383, 395 (2017)). To that end, by

requiring "just compensation," the Takings Clause "is 'designed to bar

Government from forcing some people alone to bear public burdens which, in all

fairness and justice, should be borne by the public as a whole.' " Arkansas Game

& Fish Comm'n v. United States, 568 U.S. 23, 31 (2012) (quoting Armstrong v.

United States, 364 U.S. 40, 49 (1960)) (additional citations omitted).

The Fifth Amendment right to compensation for the deprivation of property

applies to both real property and personal property, such as the plaintiff's motor

vehicle. See Horne v. Dep't of Agric., 576 U.S. 350, 358 (2015) ("The

Government has a categorical duty to pay just compensation when it takes your

car, just as when it takes your home.").  The Takings Clause also applies to

temporary takings. See Kimball Laundry Co. v. United States, 338 U.S. 1, 7

(1949); First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.,

Cal., 482 U.S. 304, 318 (1987).  Additionally, when the government takes

possession of property without acquiring title, it commits a physical taking. Cedar

Point, 594 U.S. at 147 (citing United States v. Pewee Coal Co., 341 U.S. 114,

115–117 (1951) (plurality opinion)).  Physical appropriations of private property

constitute "the clearest sort of taking." Id. at 148 (citations omitted).  They are assessed "using a simple, *per se* rule: The government must pay for what it takes." Id.

The United States Constitution also protects "[t]he right of the people to be secure in their...effects[] against unreasonable searches and seizures[.]" U.S. CONST. AMEND. IV.  That right "shall not be violated[.]" Id.  Furthermore, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The warrant requirement stands as "[t]he bulwark" of privacy protections. Franks v. Delaware, 438 U.S. 154, 164 (1978).  Absent certain exceptions, police are required to "obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." Id.  Additionally, the Fourth Amendment requires that all warrants contain particular descriptions of things to be seized. See Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). This particularity requirement prevents the seizure of one thing under a warrant describing another. United States v. Christine, 687 F.2d 749, 752 (3d Cir. 1982) (quoting Marron v. United States, 275 U.S. 192, 196 (1927)).

Nonetheless, "the principal object of the Fourth Amendment is the protection of privacy rather than property[.]" Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 304, (1967).  Property interests do not control the right of the

government to search and seize. Id.  The government may seize evidence simply for the purpose of solving and proving crimes. Id. at 306.  Thus, it is reasonable, within the terms of the Fourth Amendment, to conduct searches for the purpose of obtaining evidence which would aid in the apprehension and prosecution of criminals. See Messerschmidt v. Millender, 565 U.S. 535, 551 (2012) (citing Hayden, 387 U.S. at 307) (determining that it was reasonable under the circumstances for police to search for evidence of gang membership to establish motive and support additional criminal charges).

Among the powers reserved to the States (or the people) are police powers, those "inherent and necessary" powers "essential to the very existence of civil society, and the safeguard of the inhabitants of the state against disorder, disease, poverty, and crime." Leisy v. Hardin, 135 U.S. 100, 127 (1890) (dissenting op.).

Beyah and Durrant allegedly used Kelly's vehicle to flee from the scene of a gunfight in the streets of Williamsport, Pennsylvania.  By state classification, Williamsport is a third class city.  Pennsylvania's Third Class City Code, 11 Pa. Cons. Stat. §§ 10101–14702, declares that "police officers shall be ex-officio constables of the city and shall enforce the laws of this Commonwealth or otherwise perform the functions of their office in accordance with" the police jurisdiction statutes. 11 Pa. Cons. Stat. § 12005 (citing 42 Pa. Cons. Stat. §§

17

8952–8953).  In this case, the Williamsport Bureau of Police seized Kelly's vehicle pursuant to a search warrant, the validity of which Kelly does not dispute. Defendant Salisbury obtained that warrant to investigate crime and enforce the Commonwealth's criminal laws.  Ultimately, that means the Bureau of Police seized Kelly's vehicle using "its literal police powers" in response to the shooting.[9]  Frein, 47 F.4th at 247.

The Takings Clause's right to just compensation coexists with the States' police powers. See Sheetz v. Cnty. of El Dorado, California, 601 U.S. 267, 274 (2024) (discussing the coexistence between the Fifth Amendment right to just compensation for takings and the States' ability to regulate land use).  "As long recognized" with respect to property rights, "some values are enjoyed under an implied limitation and must yield to the police power." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922).

## 2. Frein v. Pennsylvania State Police and its Application in this Case

The Williamsport Bureau of Police seized Kelly's vehicle pursuant to a search warrant in April 2022 and released it in June 2022.  In December 2022, Kelly filed this action asserting that the police violated Section 1983 by depriving

---

[9] Courts define police powers using broad terms, such as "the authority to provide for the public health, safety, and morals[.]" Barnes v. Glen Theatre, Inc., 501 U.S. 560, 569 (1991).  Other definitions include "peace and quiet" and "law and order" as some of "the more conspicuous examples of the traditional application of the police power to municipal affairs." Berman v. Parker, 348 U.S. 26, 32 (1954).

18

her of her vehicle without just compensation.  Approximately four months prior, in August 2022, the Third Circuit Court of Appeals issued its decision in Frein. Frein determined that a Takings Clause claim could proceed where the government held on to guns seized as evidence following the conclusion of a criminal case. 47 F.4th at 251–53.

In Frein, the Third Circuit Court of Appeals addressed a Takings Clause claim asserted by Eugene and Deborah Frein. Id. at 250.  The Freins had 46 guns seized by the Pennsylvania State Police during the manhunt for their son after he murdered one state trooper and wounded another during an ambush. Id. The Commonwealth eventually captured and prosecuted the son. Id. A jury found him guilty and sentenced him to death. Id.  The Commonwealth never used the parents' guns at the son's trial, his sentencing, or on appeal. Id.  Charges were never filed against the parents. Id.  The state never alleged that the guns were involved in the son's crimes. Id.  Even after the son exhausted his direct appeals some eight years after the crimes, the Pennsylvania State Police refused to return the parents' guns. Id.

The Freins filed their action in this district court.  The court dismissed the parents' Taking Clause claim pursuant to Rule 12(b)(6), relying upon a nonprecedential Third Circuit opinion. 530 F. Supp. 3d 526, 530 (M.D. Pa. 2021) (citing McKenna v. Portman, 538 F. App'x. 221 (3d Cir. 2013) (nonprecedential)).

In McKenna, the Third Circuit had held "there can be no cognizable Fifth Amendment 'takings' claim when property is seized pursuant to a lawful search warrant." 538 F. App'x at 224.  McKenna thus supported the idea that there was a categorical exclusion to Takings Clause claims where property was seized pursuant to a government's exercise of police powers. Id. (citations and footnote omitted); see also Zitter v. Petruccelli, 744 F. App'x 90, 96 (3d Cir. 2018) (nonprecedential) (similarly rejecting a Takings Clause claim where oysters were seized pursuant to a lawful search warrant).  Then, without reference to McKenna or Zitter, the Third Circuit reversed the district court's ruling on the Freins' takings claim, providing the law relied upon by the parties here in their cross-motions for summary judgment. 47 F.4th at 251–53.

Frein authorized a takings claim where the police retain evidence or potential evidence beyond the conclusion of criminal proceedings, referencing English law, our nation's history and legal traditions, and more recent jurisprudence in its analysis. Id. at 251–53.  Pursuant to that analysis, warrants "are a limited exception to the rule against taking private property" and this exception is to be applied narrowly. Id. at 252.  Furthermore, under the law, any warrant immunity provided to government officials runs out when the warrant's justification runs out. Id. at 253.  The Third Circuit identified that moment as sometime after the criminal case had concluded. Id. ("We need not decide when,

after the criminal case, this liability accrues and whether the plaintiff must first demand return of the property and be refused.").

In <u>Frein</u>, the warrant's justification ran out when the son's conviction became final, not after he exhausted collateral review, because the warrant for the parents' guns was tied to the son's trial.[10] <u>Id.</u> at 252–53, 256. Accordingly, since the government had not compensated the parents for the guns in <u>Frein</u>, they had a valid claim against the Commonwealth. <u>Id.</u> at 253, 258.

Conversely, the analysis in <u>Frein</u> also supports a Takings Clause carve-out for warrants, which the Third Circuit referred to as an immunity. <u>Id.</u> at 252–53. This immunity cloaks officers so long as:

> 1) The government stayed within the scope of the warrant, <u>id.</u> at 252;
>
> 2) The warrant was tied to a particular crime or wrong and was supported by probable cause, <u>id.</u>;
>
> 3) The government seized evidence for use in a criminal investigation and trial, <u>id.</u> at 253 (citing <u>United States v. Chambers</u>, 192 F.3d 374, 376 (3d Cir. 1999); and
>
> 4) The government took action with respect to the property before any immunity ran out by either:
>
>> a. Returning the property once criminal proceedings concluded; or

---

[10] The Third Circuit posited that continued seizure could be justified for collateral review by a new warrant, or "a new investigation or prosecution." <u>Frein</u>, 47 F.4th at 253.

      b.  Justifying their continued possession after the
           criminal case ended through various recognized
           avenues, <u>id.</u>

To date, the Third Circuit has not elaborated with respect to warrant immunity for takings claims stemming from police evidentiary seizures.[11] Earlier in these proceedings, however, upon consideration of Defendants Bell, Snyder, and the City of Williamsport's motion to dismiss, Chief Judge Matthew W. Brann determined that Kelly stated a plausible Takings Clause claim. <u>Kelly v. Bell</u>, No. 4:22-CV-01940, 2023 WL 3161643, at *4 (M.D. Pa. Apr. 28, 2023). Judge Brann determined that, based on the facts alleged, Kelly's takings claim "check[ed] all the Fifth Amendment boxes." <u>Id.</u> (quoting <u>Frein</u>, 47 F. 4th at 251). Judge Brann also determined that Defendants Bell and Snyder were not entitled to qualified immunity.[12] <u>Id.</u> at *4, n. 54.

---

[11] Only just recently, the Third Circuit relied on <u>Frein</u> in the context of a Fourth Amendment claim, stating "that property legally seized as part of a criminal trial must be returned after the end of a trial unless it is contraband or subject to forfeiture[,]" and "that the government may lawfully seize property if some Fourth Amendment justification exists…but this justification can run out[.]" <u>Honda Lease Tr. v. Malanga's Auto.</u>, No. 24-2369, --- F.4th ----, 2025 WL 2640082, at *8 (3d Cir. Sept. 15, 2025) (citing <u>Frein</u>, 47 F.4th at 252–53; <u>United States v. 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.</u>, 584 F.2d 1297, 1302 (3d Cir. 1978) ("<u>608 Taylor Ave.</u>")).

[12] Kelly filed this action on December 6, 2022, naming Bell, Snyder, and the City of Williamsport as defendants. (Doc. 1). This matter was reassigned from Judge Brann to the undersigned on November 7, 2023. On April 9, 2024, Kelly filed a separate action against Defendant Salisbury and the City of Williamsport. <u>Kelly v. Salisbury</u>, No. 4:24cv608 (Doc. 1). By order dated June 13, 2024, the court granted defendants' unopposed motion to consolidate the two related lawsuits. (Doc. 27).

Defendants Salisbury and the City of Williamsport then filed a separate motion to dismiss under Rule 12(b)(6). (Doc. 28). Salisbury sought dismissal based on qualified immunity. <u>Id.</u>

These earlier rulings were shaped only based upon Kelly's allegations and decided using the Rule 12(b)(6) standard.  According to Kelly, then and now, defendants had no justification to keep her vehicle after execution of the search warrant. (See Doc. 1, Compl. ¶¶ 11–13, 23–24, 31–34; Doc. 49, Pl. Br. in Supp MPSJ at 11; Doc. 56, Pl. Br. in Opp. to Def. MSJ at 8, 11–12).  Prior to an answer being filed, however, the defendants were not able to raise any defenses or produce any evidence to challenge Kelly's allegations of a Takings Clause violation.

### 3. Kelly is Not Entitled to Summary Judgment Regarding the Police Officers' Liability

As reflected in her briefing, Kelly's Takings Clause claim is wholly dependent on how Frein applies to the facts presented here. (Doc. 44, Pl. Br. in Supp. of MPSJ at 9–11; Doc. 54 at 1–6, Pl. Reply Br. MPSJ; Doc. 56 at 5–10, Pl. Br. in Opp. to Def. MSJ).  At the outset, Frein is distinguishable by its facts.  Frein involved guns.  This case involves a car, so there are no Second Amendment questions to be resolved.  In Frein, the government held onto to the parents'

---

The City of Williamsport advanced that Kelly had not pled a plausible municipal liability claim under Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978).  Given the peculiar procedural circumstances created by the initiation of the second action against Defendant Salisbury after he had already been deposed and indications from defendants that they intended to file a motion for summary judgment, the court deferred a ruling on whether Defendant Salisbury enjoys qualified immunity in these consolidated cases. Kelly v. Bell, No. 4:22cv1940, 2024 WL 5111955, at *3–*4 (M.D. Pa. Dec. 13, 2024).

guns for years, even after the son's criminal case concluded. Here, the Bureau of Police held onto Kelly's vehicle for about two weeks longer than it took the parties to brief the cross-motions. The Third Circuit in <u>Frein</u> also faced a factual scenario where the Commonwealth still had the parents' guns. Here, the Williamsport Bureau of Police released Kelly's vehicle before her state court return petition could be heard by a Lycoming County judge. On that issue in <u>Frein</u>, the Pike County Court of Common Pleas denied a similar petition in a one-sentence order. 47 F.4th at 250. Here, Judge Linhardt cited to statutes and case law as to why Kelly could not recover her attorneys' fees and costs after she stipulated that she was not seeking reimbursement for the two-month loss of her vehicle. (Doc. 47-11, Def. Appx. 11).

These factual distinctions, however, do not change the text of the Fifth Amendment or the discussion in <u>Frein</u>. To proceed with her Takings Clause claim, Kelly must demonstrate that: 1) her "private property"; 2) was "taken" by the government; 3) "for public use"; and 4) "without just compensation." <u>Frein</u>, 47 F.4th at 251. At summary judgment, there is no dispute that Kelly's Infiniti QX30 was her private property; it was seized by Defendant Salisbury for nine weeks; and plaintiff has not received any compensation from the City of Williamsport for the period her vehicle was seized by police.

However, summary judgment is not automatic based on plaintiff's evidence of a taking. Kelly tacitly admits the same: "There can be no doubt that in this instance, the individual Defendants have all violated Farrah Kelly's Fifth Amendment rights by temporarily taking her car *without legal authority* and without just compensation." (Doc. 44, Pl. Br. in Supp. MPSJ at 11) (emphasis added). Like Kelly, defendants also acknowledge that there is another component in this case beyond the plaintiff meeting each element listed in the Takings Clause. They argue: "The investigation was still ongoing and the vehicle had evidentiary value so [the police] had the right to retain the vehicle. They were *immunized* from any takings claim." (Doc. 50, Def. Br. in Opp. MPSJ at 13–14) (emphasis added).

Kelly's argument implicitly adds an extra element to her own case. Defendants' argument appears to advance an affirmative defense. The court forecasts that the defendants' argument is in line with how the appellate courts would rule regarding the parties' burdens.

To restate and explain further, "a Fifth Amendment claim is premature until it is clear that the Government *has both taken property* <u>and</u> *denied just compensation*." <u>Horne</u>, 569 U.S. 513, 525–26 (2013) (emphasis added). Takings Clause jurisprudence thus does not support modifying the "taking" or "public use" elements of a plaintiff's case when a judicial warrant is involved in the seizure of

physical evidence. See Frein, 47 F.4th at 251 (determining that guns seized for use in an investigation and criminal prosecution were "taken" and pressed into "public use"). The "just" portion of "just compensation" refers normally to the value of the property. See Horne, 576 U.S. at 368 (citations omitted). When these elements are otherwise met, however, warrants can "immunize officials" from liability in civil rights actions. Frein, 47 F.4th at 252. Put another way, Frein referred to lawful warrants being "a limited exception to the rule against taking private property," which confers an immunity that may run out. Id. at 252, 256.

Until the law is refined by the higher courts, defendants' assertion of warrant immunity will be treated as an affirmative defense.[13] Kelly's motion for partial summary judgment thus may be best considered as a preemptive strike on defendants' warrant immunity. To prevail on that defense under the

---

[13] "An affirmative defense is an assertion raising new facts and arguments that, if proven, defeat the plaintiff's claim even if the allegations in her complaint are true." Sterten v. Option One Mortg. Corp., 479 F. Supp. 2d 479, 482 (E.D. Pa. 2007), aff'd sub nom. In re Sterten, 546 F.3d 278 (3d Cir. 2008) (citation omitted). "On the other hand, a matter that merely negates an element of the plaintiff's prima facie case is not an affirmative defense." Id. (citing Sanden v. Mayo Clinic, 495 F.2d 221, 224 (8th Cir. 1974)). Based on the analysis in Frein, warrant immunity would not change the accepted meanings of the words used in the Takings Clause. See 47 F.4th at 251.

Furthermore, the court believes that defendants' answers appropriately raise warrant immunity as an affirmative defense to plaintiff's Takings Clause claims. (See Doc. 12 at ECF p. 11; Doc. 40 at ECF p. 14 ("Plaintiff's property was seized by lawful warrant.") ("The continued retention of Plaintiff's property was not a 'taking' justifying compensation.")). Based upon Kelly's reliance on Frein in this matter and her arguments that defendants had no lawful authority to hold onto her vehicle, there can be no prejudice to plaintiff if defendants' answers did not explicitly reference warrant immunity as a defense. See Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 (3d Cir. 2001).

reasoning from <u>Frein</u>, defendants need to demonstrate that: 1) they stayed within the scope of a warrant; 2) the property seized by the warrant was tied to a particular crime or wrong and supported by probable cause; 3) the property was seized for use in a criminal investigation and trial; and 4) they returned the property once criminal proceedings concluded. <u>See</u> 47 F.4th at 252–53.

Defendants bear the burden of proving warrant immunity at trial. <u>See</u> <u>Moore v. Kulicke & Soffa Indus., Inc.</u>, 318 F.3d 561, 566 (3d Cir. 2003) (indicating that defendants have both the burden of production and persuasion with an affirmative defense). As the non-moving party with respect to Kelly's motion, defendants may defeat summary judgment by providing facts demonstrating genuine issues for trial regarding the essential elements of their case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, (1986).

In countering Kelly's motion, the officers have provided evidence supporting a warrant immunity affirmative defense: 1) the search warrant itself; 2) Defendant Salisbury's affidavit of probable cause; 3) the police investigative report; and 4) the deposition testimony of Defendant Salisbury and Defendant Bell. According to the defendants, such evidence demonstrates that the police seized Kelly's Infiniti QX30 pending investigation of a shooting. Further, per the defendants, they released the vehicle back to Kelly while the investigation into the shooting was still ongoing. Viewing this evidence in a light most favorable to

the police officers as the non-moving parties, there are material factual issues as to defendants' Takings Clause liability based on their warrant immunity defense. Kelly's motion for partial summary judgment will thus be denied in this respect.

Kelly also moves for partial summary judgment on her <u>Monell</u> claim against the City of Williamsport.  For ease of disposition, the court will set aside the municipal liability arguments to continue the discussion regarding the officers' warrant immunity in this case.

### 4. The Officers Enjoy Warrant Immunity

Defendants' motion for summary judgment advances that they are entitled to judgment as a matter of law on Kelly's Takings Clause claim based on immunity derived from the search warrant issued for the vehicle.  (Doc. 49, Def. Br. in Supp. at 5–11, 12–18).  After a thorough review of the summary judgment record, the court agrees that the police officers are immune.

As indicated above, warrant immunity is an affirmative defense, and defendants have the burden of proving this defense at trial.  To succeed with their motion for summary judgment, defendants must produce material facts, established as genuinely undisputed, that entitle them to judgment as a matter of law. <u>Mall Chevrolet, Inc. v. Gen. Motors LLC</u>, 99 F.4th 622, 630 (3d Cir. 2024) (citing Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248–52 (1986)).  At this posture, defendants have the burden of supporting their

motion with credible evidence that would entitle them to a directed verdict if not controverted at trial. In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (cleaned up).

As for Kelly, the party opposing defendants' motion, she "may not rest upon mere allegation[s] or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Id. at 248.

The defendant officers provided ample evidentiary support for their position that they are immune from Kelly's Takings Clause claim based on the search warrant and the ongoing criminal investigation.  Kelly, on the other hand, only counters with allegations and arguments, including how defendants' conduct "was a much more clear violation of rights than occurred in Frein." (Doc. 56, Pl. Br. in Opp. MSJ at 8).

For example, she argues that her "claim has nothing to do with the period of time that the police held her vehicle pursuant to a valid warrant. Rather, it is for the absolute refusal to return her vehicle to her when the Defendants had no legal justification to continue to deprive her of her property." Id. at 8 (emphasis removed).  Kelly thus appears to read Frein to require the police to have searched and returned her vehicle within days. Id. at 2, 9, 11.  Yet, at the same

time, the plaintiff block quotes the Third Circuit's entire analysis on the Takings Clause issues in Frein, which states something quite different. Id. at 7. That is, "[i]t is well settled that the government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture." Frein, 47 F.4th at 253 (quoting Chambers, 192 F.3d at 376). Kelly's position also overlooks the fact that, in Frein, the Pennsylvania State Police seized guns from the suspect's parents and then the Commonwealth never ultimately used them in his prosecution. Id. at 250. The Third Circuit's holding did not turn on prosecutors failing to use the guns as evidence, but their failure to return the guns once the criminal case concluded. Id. at 253.

Moving on to the officers' proof of warrant immunity, defendants must first demonstrate that they stayed within the scope of the warrant. Id. at 252. Defendants supplied the search warrant and affidavit of probable cause. Kelly supplied no evidence that the Bureau of Police seized things other than those listed in the warrant. By admitting the warrant was valid, Kelly admits the officers had probable cause to seize her vehicle.

Defendants must also demonstrate that the property seized by the warrant was tied to a particular crime or wrong and that the property was seized for use in investigation and trial. Id. at 252–53. Defendants provided Officer Salisbury's

affidavit of probable cause and the police investigation report.[14]  In response,

Kelly argues that "there was no pending criminal case."  (Doc. 56, Pl. Br. in Opp.

MSJ at 8). Kelly further argues that "there was no evidence being retained for the

purpose of a prosecution."  However, she offers no countervailing evidence to

support those assertions.  Rather, plaintiff avoids addressing significant portions

of the summary judgment record.

As a prime example, defendants filed a statement of material facts with

their motion for summary judgment as required by Local Rule 56.1.[15]  (Doc. 47).

Defendants' statement includes the following undisputed facts:

1.    On Sunday April 3, 2022 at 0143, Williamsport Police were
dispatched to the Bar on Market for a fight in progress.

2.    At 0145 there was a report that shots were fired.

3.    The shots fired call resulted in a bystander sustaining a gunshot
wound.

4.    Nine live round ammunition, ten spent casings, two bullet
fragments, and parts from a firearm magazine were secured
from at or near the scene.

---

[14] The court may properly consider these materials at this stage. See Clark v. Clabaugh, 20
F.3d 1290, 1294–95 (3d Cir. 1994).

[15] Under the Rules of Court for the Middle District of Pennsylvania, a party must file a separate
statement of material facts along with any motion for summary judgment. Weitzner v. Sanofi
Pasteur Inc., 909 F.3d 604, 613 (3d Cir. 2018) (citing M.D. Pa. L.R. 56.1).  A party opposing
summary judgment must file a corresponding answer to the statement of material facts, which
responds to the moving party's filing. Id.

6.    One of the people involved in the shooting fled the scene in [the plaintiff's] vehicle.

7.    The vehicle was driven by Na'il Beyah.

8.    Na'il Beyah is [p]laintiff's son.

10.    Na'il would drive the vehicle back in April of 2022.

11.    He was not residing with [p]laintiff at that time.

12.    He would keep the vehicle where he was residing or staying.

14.    He was permitted to take the vehicle whenever he wanted.

Id. (citations to the evidentiary record omitted) (spelling corrected).

Kelly responded to each of these numbered paragraphs: "This is not a material fact." (Doc. 55).  The court disagrees. See Mall Chevrolet, Inc., 99 F.4th at 631 ("A fact is material if its resolution 'might affect the outcome of the suit under the governing law.' ") (quoting Anderson, 477 U.S. at 248).  This case comes down to the reasons why Defendant Salisbury seized Kelly's car pursuant to a warrant and held it for nine weeks.  After review, Paragraphs 1-4, 6-8, 10-12, and 14 are uncontroverted by other evidence in the record. Some of those paragraphs are supported by Kelly's own deposition testimony.  They will be admitted as true.

Further, as alluded to in the background section of this memorandum, the summary judgment record reflects a significant ongoing police investigation into the shooting.  The record reflects no reason to charge the plaintiff herself.

However, the details of Defendant Salisbury's affidavit of probable cause articulate his investigation into possible crimes by Beyah and Durrant for assault and for violation of state firearms laws.

Returning to the Local Rule 56.1 statements of material fact, defendants averred:

> 39.    The case was not closed until July 14, 2022. [Doc. 47-1, App. 1 at p. 20.]

> 40.    At the time it was closed, it is noted that "there may be additional charges coming against other individuals involved in this case at a later date." Id.

(Doc. 47).

Plaintiff responded by stating: "the closing of the 'case' " and "[a]ny notation in relation to the closing of the 'case' by [d]efendants is not a material fact. By way of further answer, there was never a criminal case because charges were never filed against anyone." (Doc. 55, Pl. Resp. to Def. SOF ¶¶ 39–40). Given defendants' reliance on warrant immunity, the above facts are material. A review of the record reflects that these facts are uncontroverted by other evidence. Based on plaintiff's deficient response, these facts are admitted as true.

Furthermore, contrary to Kelly's response, defendants' evidence demonstrates that there was a criminal case. Charges were filed against someone, that is, Daimeer Clark. As part of the investigation, Defendant Salisbury did ultimately seek an arrest warrant for that individual, on May 18,

33

2022. (Doc. 47-1 at ECF p. 21). Authorities apprehended Clark on May 23, 2022 in Philadelphia and transported him back to Williamsport to face multiple felony and misdemeanor charges. Id. at 3, 21. Further, on May 27, 2022, another agency turned over Clark's cell phone to Defendant Salisbury along with a stolen Williamsport police department firearm, which were recovered in his apprehension. Id.

The summary judgment record does not indicate whether Salisbury obtained a warrant to download data from Clark's cell phone. The record also does not reflect the disposition of Clark's charges. On the other hand, the uncontroverted record does indicate that, five days after authorities found Clark hiding out in Philadelphia, Officer Salisbury called Kelly to release her vehicle, meeting the final warrant immunity requirement discussed in Frein.

To her credit, Kelly did proffer testimony from Defendant Salisbury supporting that police held her vehicle for approximately another month after the officer learned that data could not be downloaded from the Infiniti's "infotainment system" by the Pennsylvania State Police. Kelly, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252 (1986).

After review of the record, the details about Salisbury ruling out the "infotainment system" as a source for potential leads was just one part of an ongoing police investigation into a shooting. That investigation also includes Salisbury's efforts to determine why the shooting occurred, i.e., the motives of Beyah, Durrant, and Clark. (Doc. 47-1 at ECF pp. 20–21 (detailing a recorded interview with a witness)). She did not ask any questions probing the details of Salisbury's investigation into the motives of Clark, Durrant, or even her son.

In that respect, Kelly has not otherwise countered defendants' evidence that individuals fled from the scene of a shooting using her vehicle and that Officer Salisbury was pursuing various leads to prosecute all those involved, including possibly the plaintiff's son and his passenger. Kelly has also not countered evidence that the police returned Kelly's vehicle before the investigation into the shooting concluded. At this juncture, there are no genuine issues of material fact as to whether the warrant for Kelly's vehicle was tied to particular crimes. There are also no genuine issues of material fact as to whether the vehicle was seized to investigate, solve, and prosecute those crimes. Summary judgment will thus be entered in favor of Officer Salisbury and his supervisors Captain Bell and Chief Snyder based on their warrant immunity.

As for the issues remaining in the cross-motions, Defendant Salisbury and his supervisors also assert that they are entitled to qualified immunity.  The court previously deferred a ruling on Salisbury's qualified immunity when he filed a motion to dismiss in response to Kelly's complaint against him.  Before that, Chief Judge Brann denied qualified immunity to Bell and Snyder when they asserted it in response to Kelly's initial complaint.  Although there may be good reason to thoroughly revisit the qualified immunity rulings under both prongs of the appropriate test, the court sees no need to do so under the circumstances. The officers enjoy warrant immunity under the law.  If Kelly's evidence was sufficient to withstand the motion for summary judgment on that issue, the law was not clearly established in April and May 2022 that the officers would be liable for a Fifth Amendment taking under the facts of this case. [16]  The officers thus also enjoy qualified immunity.

---

[16] To determine whether a right was clearly established, the court conducts a two-part inquiry, defining the right and then assessing whether a clearly reasonable official would understand that his conduct violated that right. Rivera v. Redfern, 98 F.4th 419, 422 (3d Cir. 2024).  Kelly appears to define her right as the right to just compensation when the police continue to seize a vehicle after a search and seizure pursuant to a valid warrant. (Doc. 44, Def. Br. in Supp. MPSJ at 10). Based on the context of this case, the court adds to the end of that sentence "undisputedly tied to crimes and for the purposes of a criminal investigation." As for the second part of the inquiry, which requires consideration of existing court precedent, "[t]he extant case law must be derived from established Supreme Court and Third Circuit precedent," Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 645 (3d Cir. 2024). Finding no United States Supreme Court decisions on point, precedential decisions of the Third Circuit stand for the general proposition that the government is permitted to seize evidence for use in investigations and trial, but may not by exercising its power to seize, effect a de facto forfeiture by retaining the property seized indefinitely. 608 Taylor Ave. 584 F.2d at 1302.  Thus, no reasonable officer in April or May 2022 would have known his decision to keep a vehicle as evidence for two

Finally, the parties also each seek summary judgment on Kelly's <u>Monell</u> claim against the City of Williamsport.  Although the record contains uncontroverted evidence supporting summary judgment on several different grounds, defendants' motion will be granted based on Kelly's failure to demonstrate that she experienced an unlawful government taking.  "It is well-settled that, if there is no [constitutional] violation in the first place, there can be no derivative municipal claim." <u>Mulholland v. Gov't Cnty. of Berks, Pa.</u>, 706 F.3d 227, 238, n.15 (3d Cir. 2013) (citing <u>Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986); <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 505 (3d Cir. 2003)).  Summary judgment will thus also be entered in favor of the City of Williamsport.

**Conclusion**

For the reasons set forth above, Kelly's motion for partial summary judgment will be denied.  Defendants' motion for summary judgment will be granted.  The Clerk of Court will be directed to enter judgment in favor of the defendants and close this case.  An appropriate order follows.

---

months after it was searched would have violated the Takings Clause.  Furthermore, to the extent that <u>Frein</u> "clearly establishes" the right Kelly asserts here, which the undersigned concludes it does not, that decision was issued by the Third Circuit in August 2022, or approximately two months after the police released the vehicle back to the plaintiff.

Date: _9/30/25_

JUDGE JULIA K. MUNLEY
United States District Court